IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ERIC GORDWIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-16-1474 |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 9) and Defendant's Cross-Motion for Summary Judgment (Doc. 10). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's motion.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claims for

---

[1] Carolyn W. Colvin was the Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Nancy A. Berryhill is Acting Commissioner of the SSA and, as such, is automatically substituted as Defendant. See Fed. R. Civ. P. 25(d).

[2] The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Doc. 14, Ord. Dated Apr. 14, 2017.

disability insurance benefits under Title II and for supplemental security income under Title XVI of the Social Security Act ("the Act").

## A. **Medical History**

Plaintiff was born on February 11, 1977, and was thirty-four years old on the alleged disability onset date.[3] Plaintiff is a high school graduate, and worked as a proofer at Compass Bank until he was laid off in 2012.[4]

### 1. **Physical Impairments**

Prior to the alleged disability onset, Plaintiff was diagnosed with osteosarcoma, a type of bone cancer, in 1994, which was treated through chemotherapy and the amputation of his right leg above the knee.[5] As a side effect to the chemotherapy, Plaintiff experienced hearing loss, especially with "high frequency sounds."[6] Plaintiff qualified for the use of hearing aids in March 2013.[7]

On March 4, 2010, Plaintiff visited the Kelsey-Seybold Clinic, for pain and phantom-limb issues.[8] The doctor noted that Plaintiff did not have a prosthesis and was experiencing a neuroma-like

---

[3]  See Tr. of the Admin. Proceedings ("Tr.") 34, 38.

[4]  See Tr. 32-38.

[5]  See Tr. 281-85.

[6]  See Tr. 286.

[7]  See Tr. 343.

[8]  See Tr. 292.

pain.[9]  Plaintiff returned on September 14, 2010, and inquired about obtaining a prosthesis or a different type of crutches to ambulate, stating that he was "tired of getting around on his crutches."[10]

On June 28, 2012, Plaintiff underwent a consultative physical examination with A. Rashad Cheema, M.D., ("Dr. Cheema"), who noted his medical history, daily activities, pain, and physical abilities.[11]  As of the date of this appointment, Plaintiff had obtained his prosthesis.[12]  On a daily basis, after waking up, Plaintiff would clean his prosthesis, attach it, drive over to his grandmother's house, exercise with weights, play games, and sit.[13] In terms of Plaintiff's physical abilities, Dr. Cheema reported that he could: walk for ten to fifteen minutes with the prosthesis, stand for five to fifteen minutes, lift thirty pounds when standing, and manipulate and grasp objects well.[14] Dr. Cheema noted that "[h]e [was] still learning to walk with the prosthesis and getting full knowledge of it" and that he had a normal range of movement in all of his joints, excluding his right leg.[15]

---

[9]    See id.

[10]   Tr. 294.

[11]   See Tr. 304-06.

[12]   See Tr. 304.

[13]   See id.

[14]   See id.

[15]   See id.

Plaintiff reported phantom pain in his right leg that would last all day and hinder his ability to sleep; Plaintiff stated that the pain was a ten out of ten and that it was worse when he became "frustrated."[16] Dr. Cheema noted that Plaintiff was "overweight," with his weight recorded at 245 pounds, he was "not depressed," and that his cancer was in total remission.[17] Dr. Cheema concluded that Plaintiff "will be able to work at a job that requires sitting because his upper extremity is good."[18] Plaintiff underwent an x-ray on that same day which showed that his amputation occurred at the midshaft level of Plaintiff's right femur bone, but that Plaintiff had "no fractures or destructive lesions."[19]

Magnetic resonance imaging ("MRI") of Plaintiff's left knee on October 1, 2012, revealed that he had osteoarthritis in his left knee and that his kneecap was "slightly" dislocated.[20]

On January 2, 2013, Plaintiff presented to TMC Orthopedic for service on his prosthesis and was given a prosthesis to borrow while the knee unit on his was being serviced.[21] It was noted that Plaintiff "arrived for this appointment walking independently with

---

[16]    Tr. 305.

[17]    See id.  In June 2013, his weight was 248 pounds, and his body mass index was recorded at 34.59, in the obese range.  See Tr. 392.

[18]    See Tr. 306.

[19]    See Tr. 307.

[20]    See Tr. 377.

[21]    See Tr. 369.

no assistive devices" and that once he put on the borrowed prosthesis, he was able to move "unassisted and had no complaints."[22] Plaintiff returned on January 16, 2013, where it was noted that he was able to walk on his own with the prosthesis and without an assistive device.[23] It was noted that the socket on his prosthesis needed replacement because it was "ill fitting," causing him "greater energy expenditure to walk, a lack of control of the prosthesis [affecting Plaintiff's] gait, [and] discomfort due to know [sic] anatomical support which will lead to skin problems if not corrected."[24]

On January 28, 2013, Plaintiff's primary care physician, Franchelle Bailey, M.D., ("Dr. Bailey") filled out a physical RFC questionnaire.[25] Dr. Bailey noted that she had seen Plaintiff every six weeks for five months and that she had diagnosed his having an above right knee amputation, moderate to severe left knee pain, and depression.[26] Dr. Bailey stated that Plaintiff had "intense pain on a daily basis" from walking, as evidenced by an MRI showing arthritis in his knee.[27]

---

[22]    Id.

[23]    See Tr. 368.

[24]    See id.

[25]    See Tr. 409-11.

[26]    See Tr. 409.

[27]    See id.

In an eight-hour work day, Dr. Bailey opined that Plaintiff could sit for at least six hours and stand or walk for about two hours, and that he would need to be able to shift positions at will while working.[28] Dr. Bailey indicated that Plaintiff would require two unscheduled ten-minute breaks during a work day.[29] In terms of physical activities, Dr. Bailey noted that Plaintiff could: frequently carry less than ten pounds, occasionally carry ten pounds, and never carry twenty or fifty pounds; frequently look down, turn his head right or left, look up, hold his head in a static position, and twist; and never stoop or bend, crouch or squat, climber ladders, or climb stairs.[30] Dr. Bailey predicted that Plaintiff would have good and bad days if he was working, and he would need to be absent one day a month because of his condition or for treatment.[31]

Plaintiff underwent a physical evaluation on August 20, 2013.[32] Plaintiff reported his medical history, including that he was having pain on his left side due to compensating for the prosthesis.[33] Daryl K. Daniel, M.D., ("Dr. Daniel") noted that

---

[28]   See Tr. 410.

[29]   See id.

[30]   See Tr. 410-11.

[31]   See Tr. 411.

[32]   See Tr. 402-04.

[33]   See Tr. 402.

Plaintiff had a "heavy right limp" when walking but that he could move from standing to sitting back to standing with no difficulty.[34] His weight was 250 pounds as of the date of this appointment.[35] Dr. Daniel found that Plaintiff was not able to walk on his toes and heels or squat.[36] Overall, Dr. Daniel concluded that Plaintiff had chronic tinnitus, sensorineural hearing loss, degenerative joint disease in his left knee, and history of right above-the-knee amputation with phantom pain.[37]

On this same date, Plaintiff had an x-ray of his left knee.[38] This x-ray showed "[n]o discernible fracture or dislocation" and "[m]inimal osteoarthritic change of the left knee."[39] The radiologist noted that a future MRI may be needed if Plaintiff's symptoms increased.[40]

### 2. Mental Impairments

Plaintiff attended five counseling sessions with Lesajean M. Jennings, Psy.D., ("Dr. Jennings") at the Texas Department of Assistive and Rehabilitative Services ("DARS") beginning on March

---

[34]   See Tr. 404.

[35]   See Tr. 403.

[36]   See Tr. 404.

[37]   See id.

[38]   See Tr. 405.

[39]   See id.

[40]   See id.

20, 2013.[41]   It was noted that Plaintiff was experiencing depression, felt "trapped" due to his financial situation and disability, had phantom pain and ringing in his ears, and believed his prosthetic leg was a "poor fit."[42]   On April 10, 2013, Dr. Jennings remarked that Plaintiff had been considering employment options, but was "making few real movements towards employment."[43] Plaintiff reported that he did not want a desk job, but did not think he could perform a driving job because of pain in his foot and leg.[44]  Plaintiff decided not to continue counseling after five sessions, to which Dr. Jennings noted that she "h[ad] concerns about his poor mental health" and that "[h]e remain[ed] depressed and hopeless."[45]

On February 5, 2013, Plaintiff saw Larry Pollock, Ph.D., ("Dr. Pollock") for a psychological evaluation.[46]  Plaintiff reported that his depression began when he was diagnosed with cancer, and that he was experiencing "low motivation, difficulty sleeping, and fe[lt] hopeless and helpless."[47]  Dr. Pollock noted that Plaintiff was able

---

[41]   See Tr. 336-56.

[42]   See id.

[43]   Tr. 352.

[44]   See Tr. 350, 353.

[45]   Tr. 339.

[46]   See Tr. 322-30.

[47]   See Tr. 323.

to walk on his own at a slow pace.[48]   After Plaintiff underwent a series of tests, Dr. Pollock diagnosed Plaintiff with major depressive disorder and borderline intellectual functioning.[49]   As a result of these diagnoses, Dr. Pollock assessed the following functional limitations: (1) episodes of depression; (2) loss of energy; (3) low self-esteem; (4) decreased attention and concentration; (5) feelings of despair and hopelessness; (6) loss of motivation; (7) irritability; (8) decreased effectiveness and productivity at work; (9) poor academic skills; (10) concrete thought processes; (11) limited problem solving abilities; and (12) poor planning ability.[50]   Dr. Pollock noted that Plaintiff wanted a prosthetic leg, was tired often, and was "not interested in finding employment."[51]   Dr. Pollock assigned Plaintiff a global assessment of functioning ("GAF") score of fifty-one, showing moderate symptoms.[52]

Plaintiff visited Tonna D. Pate, Psy.D., ("Dr. Pate") on May 14, 2013, for a consultative psychological examination.[53] Plaintiff's reported symptoms included: feeling depressed; low

---

[48]   See Tr. 324.

[49]   See Tr. 326.

[50]   See Tr. 326-27.

[51]   See Tr. 327-28.

[52]   See Tr. 330.

[53]   See Tr. 331-34.

social interaction, especially outside of his family; overeating and subsequent weight gain; difficulty sleeping due to phantom pain; and anxiety.[54] Dr. Pate noted that Plaintiff had been receiving treatment with DARS, that he was "try[ing] to find work," and that, although he felt fatigued toward the end of his employment and was laid off due to the economy and his performance, "he would like to return to work."[55] Dr. Pate gave Plaintiff a GAF score of sixty-three, indicating mild symptoms.[56] Overall, Dr. Pate assessed that Plaintiff had major depressive disorder and average intelligence.[57] Additionally, Dr. Pate mentioned that Plaintiff wore his prosthetic leg, walked slowly with a limp, and used a cane.[58]

Plaintiff saw Merrill P. Anderson, Ph.D., ("Dr. Anderson") on August 12, 2013, for a psychological evaluation.[59] Most of the historical information shared by Plaintiff was similar to that which was shared in prior evaluations.[60] However, it was noted that he had experienced suicidal ideation and "deteriorated functioning

---

[54]    See Tr. 331.

[55]    Tr. 331-32.

[56]    See Tr. 333.

[57]    See Tr. 333.

[58]    See Tr. 332.

[59]    See Tr. 397-400.

[60]    See id.

over the past year" due to his depression.[61]  Dr. Anderson found
that Plaintiff had major depression and noted that his psychosocial
stressors included his unemployment, financial problems, and
chronic knee pain, but said that his prognosis was "[f]air, and
could be improved with appropriate psychiatric management."[62]

## B.  Application to Social Security Administration

Plaintiff applied for disability insurance benefits on January
2, 2013, claiming an inability to work since December 15, 2011, and
applied for supplemental security income benefits on January 31,
2013, claiming a disability onset date of December 15, 2011.[63]  In
a disability report dated February 12, 2013, Plaintiff claimed that
his right leg amputation, depression, high cholesterol, arthritis,
phantom pain, and hearing loss limited his ability to work, and
that he stopped working due to his conditions.[64]

On July 12, 2012, Dr. Kelvin Samaratunga, M.D., ("Dr.
Samaratunga"), a nonexamining physician, evaluated Plaintiff's
physical residual functional capacity ("RFC").[65]  Dr. Samaratunga
addressed Plaintiff's physical abilities, finding that he was
capable of occasionally of lifting and/or carrying up to twenty

---

[61]    Tr. 398.

[62]    Tr. 399.

[63]    See Tr. 166-71.

[64]    See Tr. 205-06.

[65]    See Tr. 309-16.

11

pounds, frequently lifting and/or carrying ten pounds, standing and/or walking for at least two hours in an eight-hour work day, and sitting for about six hours in an eight-hour work day.[66] Due to his right leg amputation, Dr. Samaratunga noted that Plaintiff had limitations in his lower extremities.[67] Additionally, Dr. Samaratunga found that Plaintiff was able to: occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but never climb a ladder, rope, or scaffolds.[68] According to Dr. Samaratunga, the record did not establish any visual, manipulative, communicative, or environmental limitations.[69] Dr. Samaratunga concluded that Plaintiff's alleged limitations were not fully supported by the record, noting that he had phantom pain but could walk with the prosthesis.[70]

In a work history report dated February 12, 2013, Plaintiff stated that he worked as a park worker at an amusement park from January to February of 1998, as a telemarketer from January to February 1999, as a data entry clerk and proofer at a bank from January to August 2000, and as a data entry clerk from August 2000

---

[66] See Tr. 310.

[67] See id.

[68] See Tr. 311.

[69] See Tr. 312-13.

[70] See Tr. 314.

to November 2011 at another bank.[71]  In his final position, he made $30,000.00 per year and worked five days per week.[72]  Plaintiff later updated his work history to specify that he worked for Jack Henry in 2000, and for Compass BBVA from 2000 to 2011.[73]

Plaintiff completed a function report on March 3, 2013, in which he stated that he lived at home with his family.[74]  Plaintiff reported an inability to walk or stand for more than five to ten minutes and indicated that he needed help to move items.[75] Plaintiff's daily routine included bathing, watching television, eating, preparing his prosthetic leg, going outside, eating, watching more television, spending time with his family, and sleeping.[76]  In terms of personal care, Plaintiff disclosed that he had difficulty with dressing, bathing, and using the toilet, but did not need reminders to take care of himself.[77]

When Plaintiff left the house, he would drive a car and could leave the house unaccompanied.[78]  Plaintiff did not prepare his own

---

[71]   See Tr. 194.

[72]   See Tr. 195.

[73]   See Tr. 227.

[74]   See Tr. 213-20.

[75]   See Tr. 213.

[76]   See Tr. 214.

[77]   See Tr. 214-15.

[78]   See Tr. 216.

meals, complete household chores, or go shopping.[79] Plaintiff could

pay bills, count change, handle a savings account, and use a

checkbook or money orders, and noted that his conditions did not

affect his ability to handle money.[80] Plaintiff's hobbies included

watching television, which he did on a daily basis.[81]

In terms of social activities, Plaintiff spent one to two

hours a day sitting at home talking to others.[82] On a regular

basis, Plaintiff visited his grandparents' home.[83] Plaintiff was

able to leave the house on his own, and left, on average, one to

two times per week.[84] Since the onset of his conditions, Plaintiff

said he isolated himself more.[85]

The list of activities that Plaintiff indicated were affected

by his condition included: lifting, squatting, bending, standing,

reaching, walking, kneeling, hearing, stair climbing, remembering

things, understanding, and getting along with others.[86] Plaintiff

could walk for five to ten minutes before requiring twenty minutes

---

[79]    See Tr. 215-16.

[80]    See Tr. 216.

[81]    See Tr. 217.

[82]    See id.

[83]    See id.

[84]    See id.

[85]    See Tr. 218.

[86]    See id.

of rest.[87]  Plaintiff reported that: (1) his hearing deficiencies made it difficult for him to pay attention; (2) he had trouble completing tasks; (3) he could not follow written instructions well; (4) he could follow spoken instructions more effectively than written ones; and (5) he had trouble with change and stress.[88] Plaintiff's fears included the fear of "not having the ability to get around."[89]  Doctors prescribed Plaintiff an artificial limb and crutches that he used on a daily basis.[90]  Plaintiff did not report that his medications caused side effects.[91]

On May 9, 2013, and September 18, 2013, state agency nonexamining physicians found that Plaintiff's allegations were only partially credible.[92]  They both observed that he had postural, exertional, and mental limitations.[93]

Plaintiff completed another disability report on June 12, 2013.[94]  In this report, Plaintiff noted that he did not have any new limitations but said that he had been feeling "worse" since the last report he completed and that it was difficult for him to

---

[87]   See id.

[88]   See Tr. 218-19.

[89]   Tr. 219.

[90]   Id.

[91]   See Tr. 220.

[92]   See Tr. 70-93.

[93]   See id.

[94]   See Tr. 237-41.

participate in daily activities.[95]

On July 9, 2013, Plaintiff filled out a second function report, including some new information.[96] In terms of his medical condition, Plaintiff stated that he experienced depression, changes in his weight, suicidal thoughts, pain in his left leg, and difficulty sleeping due to shock pains from his amputated right leg.[97] In terms of his daily routine, Plaintiff stated that he watched television, laid in bed, and brushed his teeth.[98] Plaintiff explained that he could not longer look for jobs because he did not have a car and could not go anywhere due to his physical limitations.[99]

Plaintiff disclosed that he experienced problems with personal care including dressing and bathing, and that his mother would do his laundry, clean his room, and cook and shop for him.[100] Plaintiff stated that he did not go anywhere on a regular basis and that, because of his conditions, he did not have friends, "feel attractive," participate in activities, and felt "discouraged about everything."[101] Plaintiff reported that he did not spend time with

---

[95]    See Tr. 237, 240.

[96]    See Tr. 242-49.

[97]    See Tr. 242.

[98]    See Tr. 243.

[99]    See id.

[100]   See Tr. 243-45.

[101]   See Tr. 246.

others, and that he did not like going to family functions because his difficulty moving would cause him to be depressed, and that he could not play basketball because of the amputation.[102]

Plaintiff again indicated that he had difficulty with the following abilities: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, remembering, completing tasks, understanding, using his hands, and getting along with others.[103] With regards to walking, Plaintiff could walk for ten steps before need to rest for five to ten minutes.[104] Plaintiff would get easily "frustrated" with others, not finish what he started, and could understand some instructions, but had difficulty with spoken instructions.[105] Plaintiff's fears included his cancer returning and not having access to his prosthesis or crutches.[106] Plaintiff noted that he also used a cane.[107] The medication Plaintiff took caused drowsiness.[108]

The Social Security Administration denied Plaintiff's application at the initial and reconsideration levels.[109] Plaintiff

---

[102]    See Tr. 246-47.

[103]    See Tr. 247.

[104]    See id.

[105]    See id.

[106]    See Tr. 248.

[107]    See id.

[108]    See Tr. 249.

[109]    See Tr. 115-21, 125-29.

requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[110]  The ALJ granted Plaintiff's request and conducted a hearing on June 4, 2014.[111]

## C. **Hearing**

At the hearing, Plaintiff and a vocational expert ("VE"), Cheryl Swisher ("Swisher" or "VE") testified.[112]  Plaintiff was represented by an attorney.[113]

Plaintiff explained that he worked for Goodwill Industries in 1999, after he completed a training school course on data entry.[114] After this, Plaintiff worked in data entry for Jack Henry and Associates and then Compass Bank.[115]  At Compass Bank, Plaintiff was a proofer, where he examined checks and entered the check number.[116] Plaintiff testified that he was laid off from Compass Bank in 2012 as part of a larger reduction in force at the bank.[117]  At the time he was laid off, Plaintiff was working five days a week from 5:00 p.m. to 11:00 p.m. and was paid by salary.[118]

---

[110]  See Tr. 130-31.

[111]  See Tr. 27-57.

[112]  See Tr. 27-57.

[113]  See Tr. 27.

[114]  See Tr. 32.

[115]  See id.

[116]  See Tr. 33.

[117]  See Tr. 33, 37-38.

[118]  See Tr. 36.

Plaintiff testified that he was thirty-seven years old, a high-school graduate, never married, and had no children.[119] His right leg was amputated when he was fifteen years old and since then he had gained seventy pounds due to his physical limitations.[120] At the time of the hearing he was 5'11" and weighed between 240 to 250 pounds.[121] Plaintiff testified that he did not smoke cigarettes, he smoked cigars sometimes, and drank alcohol occasionally.[122] The last time Plaintiff had smoked marijuana was two to three years before the hearing.[123] Plaintiff explained that alcohol "[u]sed to be a problem" for him because it would cause him to become more depressed.[124] The ALJ asked Plaintiff why, in his counseling appointments, Plaintiff implied that he did not want to work anymore, and Plaintiff replied that he was "tired" and that "getting around is difficult at home."[125] While he was working, Plaintiff was able to live by himself, but his mother would come to his residence to clean and take care of him.[126]

Referencing his history of cancer, Plaintiff stated that he

---

[119]    See Tr. 38-39.

[120]    See Tr. 51-52.

[121]    See Tr. 38.

[122]    See id.

[123]    See Tr. 40.

[124]    See id.

[125]    Id.

[126]    See Tr. 41.

should see a doctor on an annual basis to confirm that he was still in remission from his cancer, but that he no longer made return appointments because he "was tired of going."[127] Plaintiff took cholesterol medication, and had been prescribed several antidepressants, but had stopped taking them because he did not enjoy taking them.[128] Besides his cholesterol medication, Plaintiff took Tylenol III for pain.[129]

Plaintiff was prescribed a prosthesis in 2011, but stopped wearing it because it gave him rashes and bumps on his leg.[130] While he was still working for Compass Bank, he used crutches.[131] Plaintiff used a prosthesis when he was younger, but had difficulty walking with it.[132] Overall, Plaintiff testified that he preferred crutches.[133] Plaintiff explained that he could not walk far with the prosthesis without needing breaks, and that walking with it made him fatigued, hurt his back, and caused pain in his left knee.[134] Plaintiff's doctor had diagnosed arthritis in his left

---

[127]     Tr. 42.

[128]     See id.

[129]     See Tr. 43-44.

[130]     See Tr. 44.

[131]     See id.

[132]     See Tr. 45-46.

[133]     Tr. 46.

[134]     See Tr. 46-47.

knee.[135]  Plaintiff testified that he also experienced swelling in his left ankle, especially when driving.[136]

In terms of his daily activities, Plaintiff said that he spent the majority of his time at home, lying down, and that he did not leave the house.[137]  Standing or walking caused Plaintiff to become "frustrated" so he would "lay in bed" and "watch TV."[138]  When asked about physical activity, Plaintiff stated that it was difficult because of his leg, and that he had exercised by swimming in the past but gave it up due to its cost.[139]  The ALJ pointed out that DARS gave Plaintiff a list of low-cost and free places to swim, and Plaintiff explained that it was too expensive to pay for the gas to get there and that he had not obtained a bus pass.[140]

At the conclusion of Plaintiff's testimony, Swisher discussed Plaintiff's past work history and the capability of an individual with Plaintiff's RFC to perform those or other jobs.[141]  Swisher stated that Plaintiff's past relevant work met the Dictionary of Occupational Titles ("DOT") definition of a data entry clerk, which Swisher considered a sedentary position, and his work at Compass

---

[135]  See Tr. 47.

[136]  See id.

[137]  See Tr. 47-48.

[138]  Tr. 48.

[139]  See id.

[140]  See Tr. 48-49.

[141]  See Tr. 52-55.

21

Bank as a proofer met the definition of a data examination clerk, which was also a sedentary position.[142]

The ALJ presented the following hypothetical individual:

> [F]or all hypotheticals assume a person the same age, education, work history as the claimant. Assume a person's limited to sitting six hours in a day and walking no more than two. Lifting ten pounds occasionally and frequently. Occasional climbing. No climbing ladders, ropes or scaffolds. Occasional balancing, stooping, kneeling, crouching, crawling. Scratch that, no crawling. Person uses crutches to ambulate. Able to understand, remember, and carry out only simple work. No production rate paced work.[143]

The VE testified that such an individual could not perform Plaintiff's past relevant work because his past work was semi-skilled.[144] However, the VE found that Plaintiff could perform positions such as order clerk, telephone solicitor, and surveillance monitor.[145]

The ALJ modified the hypothetical, stating that "the person can do simple and detailed work."[146] The VE stated that this hypothetical individual could perform Plaintiff's past relevant work as a data entry clerk and data examination clerk.[147] Additionally, the ALJ asked if these positions would allow for

---

[142]  See Tr. 35.

[143]  Tr. 52-53.

[144]  See Tr. 53.

[145]  See Tr. 53-54.

[146]  See Tr. 54.

[147]  See id.

moving between sitting and standing, and the VE explained that
while the person would need to stay at the work station, he could
move between sitting and standing throughout the day.[148]

In the next modification, the ALJ asked, "if the job required
two extra ten-minute breaks and would possibly result in one
absence a month these jobs would still be available?," to which the
VE found that the one absence a month would be feasible, but that
the ten-minute breaks would prevent this worker from "consistently
maintain[ing] competitive employment."[149]

Plaintiff's attorney presented one follow-up question of the
VE, asking if the hypothetical individual could work in these
positions without carrying anything due to his use of crutches, to
which the VE answered affirmatively, from her personal and
professional experience as a former data entry clerk.[150]

## D. __Commissioner's Decision__

On September 9, 2014, the ALJ issued an unfavorable
decision.[151]  The ALJ found that Plaintiff met the requirements of
insured status through December 31, 2016, and that Plaintiff had
not engaged in substantial gainful activity since December 15,

---

[148]    See id.

[149]    Tr. 55.

[150]    See id.

[151]    See Tr. 11-22.

2011, the alleged onset date.[152] The ALJ recognized the following impairments as severe: "right above the knee amputation; osteoarthritis of the left knee; obesity; depression; and borderline intellectual functioning" but noted that his hearing loss was not a severe impairment.[153]

Plaintiff's severe impairments, individually or collectively, did not meet or medically equal disorders described in the listings of the regulations[154] (the "Listings"), according to the ALJ.[155] In particular, the ALJ considered Listing 1.02 (major dysfunction of a joint), Listing 1.05 (amputation due to any cause), Listing 2.10 (hearing loss not treated with cochlear implantation), Listing 12.04 (depressive, bipolar, and related disorders), and Listing 12.05 (intellectual disorder).[156]

In determining Plaintiff's RFC to perform work-related activities, the ALJ discussed Plaintiff's alleged symptoms and his medical treatment and stated that he followed the regulatory requirements as to both.[157] When considering Plaintiff's symptoms, the ALJ first evaluated whether a medically determinable impairment

---

[152]   See Tr. 13.

[153]   Tr. 13–14.

[154]   20 C.F.R. Pt. 404, Subpt. P, App. 1.

[155]   See Tr. 14–16.

[156]   See id.

[157]   See Tr. 16.

could reasonably be expected to produce the alleged symptoms.[158] Second, he evaluated the "intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] [Plaintiff's] functioning," making a credibility finding for those symptoms that were not substantiated by objective medical evidence.[159]

The ALJ discussed Plaintiff's medical treatment, including records from: his cancer treatment in 1994 through 1995; treatment related to the acquisition and use of his prosthetic leg; an MRI of his left knee; findings related to his obesity and hearing loss; notes from nonexamining and examining State agency physicians; 2013 counseling sessions; Dr. Pollock's psychological examination; consultative psychological examinations by Dr. Pate and Dr. Anderson; a report from a nonexamining State agency psychologist; and a medical source statement from his treating physician, Dr. Bailey.[160]

The ALJ explained that he accorded the opinion of Dr. Bailey some, but not controlling, weight because some limitations she found were unsupported by the medical evidence.[161]  Specifically, the ALJ stated that it was unclear from the record why Dr. Bailey

---

[158]   See id.

[159]   Id.

[160]   See Tr. 16-21.

[161]   See Tr. 20-21.

stated that Plaintiff would need one work day a month off for medical appointments and need multiple daily rest breaks, when the consultative examiner stated that he could bend, stoop, and climb ramps and stairs.[162] The ALJ reasoned that the purpose of the consultative examination was to evaluate Plaintiff's abilities in these areas.[163]

The ALJ engaged in a thorough account of Plaintiff's statements regarding the symptoms that he experienced as a result of his impairments.[164] Specifically, the ALJ discussed the symptoms associated with Plaintiff's amputated leg, arthritic left knee, hearing loss, depression, and obesity.[165]

He concluded: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."[166]

The ALJ found Plaintiff capable of performing sedentary work because he could lift or carry ten pounds occasionally and less

---

[162]    See Tr. 20.

[163]    See Tr. 20-21.

[164]    See Tr. 16-21.

[165]    See Tr. 16.

[166]    Tr. 17.

than ten pounds frequently, stand or walk for two hours out of an
eight-hour work day, and sit for six hours in an eight-hour work
day.[167]  The ALJ included the following limitations in Plaintiff's
RFC: (1) no climbing of ropes, ladders, or scaffolds; (2)
occasional climbing of ramps or stairs; (3) occasional balancing,
stooping, kneeling, or crouching; (4) no crawling; (5) use of
crutches to ambulate; (6) performing of detailed, but not complex
tasks; and (7) no working at a forced or assembly line pace.[168]

The ALJ found that Plaintiff was capable of performing his
past relevant work as a data entry clerk and proofer.[169]  The ALJ
noted that, if Plaintiff was able to perform a full range of
sedentary work, the Medical-Vocational Guidelines[170] directed a
finding of not disabled.[171]  The ALJ stated that Plaintiff was a
younger individual with a high school education and the ability to
communicate in English.[172]  Alternatively, considering Plaintiff's
age, education, work experience, and RFC, the ALJ found that
Plaintiff could perform other jobs in the national economy,
including positions such as order clerk, telephone solicitor, or

---

[167]   See Tr. 16.

[168]   See id.

[169]   See Tr. 21.

[170]   See Tr. 21.

[171]   See Tr. 22.

[172]   See Tr. 21.

surveillance system operator.[173]  The ALJ concluded that Plaintiff had not been under a disability from December 15, 2011, through September 9, 2014, the date of the ALJ's decision.[174]

Plaintiff appealed the ALJ's decision, and, on March 29, 2016, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[175]  After receiving the Appeals Council's denial, Plaintiff sought judicial review of the decision by the court.[176]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) the ALJ applied proper legal standards in evaluating the record; and 2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the ultimate burden of proving he is disabled within the meaning of the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).  Under the applicable legal standard, a claimant is disabled if he is unable "to engage in any substantial gainful activity by reason of

---

[173]    See Tr. 21-22.

[174]    See Tr. 22.

[175]    See Tr. 1-4.

[176]    See Doc. 1, Pl.'s Compl.

28

any medically determinable physical or mental impairment. . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. § 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920. The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence. Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ's decision contains the following errors: (1) the ALJ erred by

finding that Plaintiff did not meet Listing 1.02A or Listing 1.05B; (2) Plaintiff's RFC did not address Plaintiff's limitations on lifting and carrying; (3) the ALJ did not properly consider the treating physician's opinion; (4) the ALJ should have asked for an updated medical expert opinion on Plaintiff's impairments; (5) the ALJ did not consider the nonexertional limitations of Plaintiff's left knee pain; (6) the ALJ failed to state the specific reasons for his determination of Plaintiff's credibility; and (7) the ALJ failed to properly inquire into the physical and mental demands of Plaintiff's past relevant work. Defendant argues that the ALJ's decision is legally sound and is supported by substantial evidence.

## A.  **Listings**

Plaintiff contends that the ALJ erred in finding that Plaintiff did not meet Listings 1.02A or 1.05B. In stating why Plaintiff did not meet these listings, the ALJ explained:

> [Plaintiff] has been fitted for and is able to use a prosthesis on his right leg, although he chooses to use crutches instead. Therefore he does not meet the requirements for listing 1.05. [Plaintiff] is able to ambulate effectively with crutches using his left leg and he is able to perform fine and gross motor movements effectively. Therefore he does not meet the requirements for listing 1.02.[177]

Listing 1.02A requires "gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on

_____
[177]     Tr. 14.

appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" and "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively." Listing 1.02A.

Listing 1.05B applies when the claimant has had one or both extremities amputated at or above the tarsal region and has "stump complications resulting in medical inability to use a prosthetic device to ambulate effectively . . . which have lasted or are expected to last for at least twelve months." Ineffective ambulation is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Listing 1.00B(2)(b).

In further explanation, the regulation section states that inability to ambulate effectively generally means "having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-hand assistive device(s) that limits the functioning of both upper extremities . . . To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. Listing 1.00B(2)(b)(1), (2). Examples given are, without limitation, "the inability to walk without the use of a walker, two crutches or two

canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." Listing 1.00B(2)(b)(2).

Here, the ALJ explained that Plaintiff had a prosthesis for his right leg, but elected to utilize crutches. The medical evidence supports this determination. In his testimony, Plaintiff testified that he preferred to use crutches because his prosthesis gave him a rash. However, many of Plaintiff's doctors, including his psychologists, noted that Plaintiff showed up for his appointments wearing his prosthesis, and sometimes used one cane. The state agency nonexamining physicians found that Plaintiff could walk solely using his prosthesis. There is no medical evidence demonstrating that Plaintiff was required to use crutches. In his appointment with Dr. Cheema, she found that he could walk with his prosthesis and had a normal range of motion in his left leg. Additionally, both Dr. Cheema and Dr. Daniel found that Plaintiff could move from a seated to standing position unassisted. Plaintiff's reports indicated that he could walk for short periods of time before resting and that he could travel on his own. While Plaintiff contends that he could not move due to his obesity and left knee arthritis, his treating physician, Dr. Bailey, stated

that Plaintiff could stand or walk for two hours in an eight-hour workday despite the arthritis and obesity. Therefore, substantial evidence supports the ALJ's decision that Plaintiff did not meet Listings 1.05B or 1.02A.

**B.  RFC**

Plaintiff takes issue with the RFC finding, arguing that the ALJ "fail[ed] to address limitations that would apply to lifting and carrying when standing or walking while holding a cane," and posits that a medical expert should have been consulted.

Plaintiff explains that "[t]he ALJ found that [Plaintiff] would need to use crutches to ambulate . . . [but] failed to adequately address the impact of the use of a [sic] crutches on [Plaintiff's] work related activities and failed to include any specific limitations in the residual functional capacity that would logically apply to an individual while attempting to lift and carry objects when walking or standing with crutches in both hands."

Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. § 404.1567(a), 416.967(a).  Social Security Ruling ("SSR") 96-9p emphasizes that the ability to lift and carry ten pounds is necessary for the unskilled sedentary occupational base.  SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996).

As to Plaintiff's contention that he could not carry items

under ten pounds while using a cane, Plaintiff does not explain why this is the case, and there is no medical evidence to support that he could not carry any object or that he had to use a cane. In fact, his treating physician stated that he could frequently carry less than ten pounds and occasionally carry ten pounds. With regards to Plaintiff's use of crutches, the ALJ included this in his RFC, as stated in his decision. Furthermore, the hypothetical questions posed to the vocational expert took into account that Plaintiff used crutches to move. As elicited by Plaintiff's counsel in the hearing testimony, the vocational expert testified that Plaintiff would not need to lift or carry objects for the data entry clerk position. The ALJ's decision is supported by substantial evidence.

## C. **Treating Physician**

Plaintiff asserts that the ALJ erred by not giving controlling weight to Plaintiff's treating physician's opinion and did not complete the proper analysis in rejecting parts of the opinion.

The ALJ must evaluate every medical opinion in the record and decide what weight to give each. See 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ is required to give good reasons for the weight given a treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

> When the determination or decision . . . is a denial[,] . . . the notice of the determination or decision must

35

contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5.

The regulations require that, when a treating source's opinion on the nature and severity of a claimant's impairments "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is to be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000); SSR 96-2p, 1996 WL 374188, at *1.

When the ALJ does not give a treating physician's opinion controlling weight, he must apply the following nonexclusive factors to determine the weight to give the opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination;" (2) the "[n]ature and extent of the treatment relationship;" (3) the relevant medical evidence supporting the opinion; (4) the consistency of the opinion with the remainder of the medical record; and (5) the treating physician's area of specialization. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Newton, 209 F.3d at 456. However, the ALJ is only required to consider these factors in deciding what weight to give a medical source opinion; he is not required to record in writing every step

of the process.  20 C.F.R. §§ 404.1527(c), 416.927(c) ("Unless we give a treating source's opinion controlling weight . . . we *consider* all of the following factors in deciding the weight we give to any medical opinion.")(emphasis added).

Even though the medical opinion and diagnosis of a treating physician should be afforded considerable weight, "the ALJ has sole responsibility for determining a claimant's disability status." <u>Martinez v. Chater</u>, 64 F.3d 172, 176 (5th Cir. 1995)(quoting <u>Moore v. Sullivan</u>, 919 F.2d 901, 905 (5th Cir. 1990)).  A medical source's statement that the claimant is "disabled" or "unable to work" does not mean the Commissioner will determine the claimant is, in fact, disabled.  <u>Spellman v. Shalala</u>, 1 F.3d 357, 364 (5th Cir. 1993)(citing 20 C.F.R. § 404.1527(e)(1)[178]); <u>see also</u> 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  The determination of disability is not a medical opinion entitled to deference, but a legal conclusion within the Commissioner's scope of authority.  <u>Frank v. Barnhart</u>, 326 F.3d 618, 620 (5th Cir. 2003).

In this case, Plaintiff asserts that it was improper for the ALJ to disregard Dr. Bailey's opinion that Plaintiff would need breaks and would miss at least one day of work a month, and that the ALJ should have discussed the five <u>Newton</u> factors in making his decision to dismiss Dr. Bailey's opinion as unsupported.  The ALJ discussed Dr. Bailey's findings, and then explained:

---

[178]    This provision was moved to 20 C.F.R. §§ 404.1527(d)(1).

SSR 96-2p states that the opinion of a treating physician should be given controlling weight only if there is no significant contradictory evidence in the record. There is no indication of why Dr. Bailey believed [Plaintiff] would require additional rest breaks from even a sedentary job or why he might miss one day of work per month, particularly considering the scarcity of treating medical visits on the record. The consultative examiner noted that the claimant had no difficulty bending or stooping, and he was able to climb ramps or stairs but not ropes, ladders, or scaffolds. Because the consultative examination was conducted particularly to assess functional abilities such as these, the findings of the consultative examiner with regard to [Plaintiff's] ability to climb, bend, or stoop are given great weight. Accordingly, for the reasons discussed herein, Dr. Bailey's opinion is given some, but not controlling weight.[179]

As explained above, the ALJ is required to consider the <u>Newton</u> factors in weighing the treating physician's opinion, but the regulations do not require that all factors be discussed in the opinion. Here, the ALJ explained the information he had about the relationship between Plaintiff and Dr. Bailey, the consistency of the opinion, and the relevant medical evidence. The court finds that the ALJ undertook a proper analysis of why Dr. Bailey's opinion was given less weight.

The Fifth Circuit has explained that with good cause, a treating physician's opinion may be given lesser weight. <u>Leggett v. Chater</u>, 67 F.3d 558, 566 (5th Cir. 1995). "Good cause for abandoning the treating physician rule includes 'disregarding statements [by the treating physician] that are brief and

---

[179]    Tr. 20.

conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.'" Id. Plaintiff takes issue with the ALJ's disregard of certain statements of Dr. Bailey's, but the opinions he disregarded were, as he explained, conclusory, without support from the medical evidence, and contradicted by other findings. The court therefore finds that the decision to disregard certain statements of Plaintiff's treating physician were supported by substantial evidence.

**D. <u>Medical Expert Opinion</u>**

Plaintiff contends that the ALJ failed to properly develop the case in two ways: (1) the ALJ did not obtain an updated medical opinion with regard to the medical equivalency of Plaintiff's combined impairments and (2) the ALJ did not consult a medical expert with regard to Plaintiff's RFC.

SSR 96-5p clarifies that equivalence is a decision based on "medical evidence only" and does not include vocational factors. SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996) (citing to 20 C.F.R. §§ 404.1526, 416.926). The ruling further explains that the requirements of listed impairments are usually objective and whether an individual's impairment meets these requirements is simply a matter of documentation. SSR 96-5p, 1996 WL 374183, at *3.

The claimant has the burden to prove that his impairment or

combination of impairments meets or equals a Listing.  Selders, 914 F.2d at 619.  If a claimant does not exhibit all of the requirements of a listed impairment, then medical equivalence may be established by showing that his unlisted impairment or combination of impairments is equivalent to a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 531 (1990).  To do so, the claimant must present medical findings that are at least equal in duration and severity to the listed findings.  See id. (citing 20 C.F.R. § 416.926(a)).  A court will find that substantial evidence supports the ALJ's finding at step three if a plaintiff fails to demonstrate the specified medical criteria.  Id. at 619-20.

Plaintiff cites to SSR 96-6p,[180] 1996 WL 374180 (July 2, 1996), and Brister v. Apfel, 993 F. Supp. 574, 578 (S.D. Tex. 1998), in support of his arguments that a medical expert should have been consulted.  "[T]he [ALJ] is responsible for deciding the ultimate legal question whether a listing is met or equaled."  SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  As to when to consult a medical expert, SSR 96-6p explains,

When no additional medical evidence is received, but in

---

[180]    SSR 96-6p was superseded on March 27, 2017, by SSR 17-2p.  SSR 17-2p has changed the rule on medical experts stating: "At the hearings level of the administrative review process, administrative law judges (ALJ) and some attorney advisors determine whether an individual's impairment(s) meets or medically equals a listing at step 3 of the sequential evaluation process.  To assist in evaluating this issue, adjudicators at the hearings level may ask for and consider evidence from medical experts (ME) about the individual's impairment(s), such as the nature and severity of the impairment(s)."  This new opinion places whether to consult a medical expert within the ALJ's discretion.  Therefore, even if SSR 17-2p was applied retroactively, the result would be the same, as it calls for a less stringent standard than SSR 96-6p.

the opinion of the administrative law judge or the
Appeals Council the symptoms, signs, and laboratory
findings reported in the case record suggest that a
judgment of equivalence may be reasonable; or

When additional medical evidence is received that in the
opinion of the administrative law judge or the Appeals
Council may change the State agency medical or
psychological consultant's finding that the impairment(s)
is not equivalent in severity to any impairment in the
Listing of Impairments.

SSR 96-6p, 1996 WL 374180, at *4 (July 2, 1996); see also Brister,

993 F. Supp. at 578 n.2 (emphasis added).  The opinion further

explains that "[w]hen an updated medical judgment as to medical

equivalence is required at the administrative law judge level in

either of the circumstances above, the administrative law judge

must call on a medical expert."  SSR 96-6p, 1996 WL 374180, at *4

(July 2, 1996).  Therefore, if the ALJ believes that any medical

evidence received after a medical opinion was obtained might change

the State agency's findings, then the ALJ must obtain an updated

opinion.

     Plaintiff cites the part of SSR 96-6p about "when additional

medical evidence is received" stating that the ALJ had to obtain a

new medical opinion.  Plaintiff speculates that the ALJ relied on

his own interpretation of the record in determining the RFC and

that too long of a time period lapsed between the nonexamining

physician determinations and the hearing and that these

determinations were not based on a complete record.  Defendant

contends that the ALJ fully developed the record.

In this case, the state agency nonexamining physicians made their determinations on May 29, 2013, and September 18, 2013. However, the latest date of Plaintiff's medical records are records from Dr. Daniel dated August 20, 2013, and in the disability determination dated September 18, 2013, these records are listed as evidence that was considered by the state agency nonexamining physician. Therefore, it is unclear what new medical evidence Plaintiff is contending was not considered in this case that would render it mandatory for the ALJ to call a medical expert under SSR 96-6p. Additionally, the ALJ did not rely on his own interpretation of the record in making his determination; rather, he undertook an extensive analysis of all the medical records supplied to him in this case.

### 2. Medical Expert to Support RFC

Plaintiff argues that the ALJ erred in failing to consult a medical expert regarding his RFC in light of his combined physical and mental impairments.

A failure of the ALJ to fully develop a record is not reversible on its own; rather, a plaintiff must demonstrate that he was prejudiced by such failure. Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996). "To establish prejudice, a claimant must show that [the ALJ] could and would have adduced evidence that might have altered the result." Id. (internal quotation marks omitted)(quoting Kane v. Heckler, 731 F.2d 1216, 1220 (5th Cir.

42

1984)).

In this case, Plaintiff fails to convey to what new limitations a medical expert would have testified at the hearing that would have resulted in a finding that Plaintiff was disabled. Courts do not reverse an ALJ's decision when a plaintiff cannot demonstrate that he was prejudiced by deficiencies in the decision. Brock, 84 F.3d at 729. Therefore, Plaintiff's argument is without merit.

**E.  Plaintiff's Nonexertional Limitations**

Plaintiff also asserts that the ALJ erred in failing to consider his nonexertional limitation of left knee pain and its limitation on his ability to work.

In his opinion, the ALJ found that Plaintiff's left knee osteoarthritis was a severe impairment. The ALJ considered Plaintiff's testimony about his left knee, evidence that Plaintiff had difficulty walking, standing, and exercising, the MRI medical evidence demonstrating that Plaintiff had "moderate to severe osteoarthritis," and Dr. Bailey's statements about the left knee pain.[181] Additionally, the ALJ stated that Plaintiff's obesity "is presumed to exacerbate his left knee pain as well as cause him some difficulties in ambulating with a prosthetic device."[182] Plaintiff's argument is without merit, as the ALJ considered

---

[181]    Tr. 17.

[182]    Id.

43

Plaintiff's left knee pain in determining his RFC.

## F.  Credibility Determination[183]

The regulations explain that, when the medical evidence reveals a medically determinable impairment that could produce pain or other symptoms, the analysis is to focus on the intensity, persistence, and limiting effects of the complained-of symptom to determine how it limits the claimant's capacity for work.  20 C.F.R. 404.1529(c)(1); see also SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)(clarifying 20 C.F.R. 404.1529(c)).  In order to evaluate the intensity, persistence, and limiting effects of the pain and other symptoms, the ALJ considers all available evidence, including medical history, medical signs and laboratory findings, and statements of treating providers, and the subjective testimony of the claimant.  20 C.F.R. § 404.1529(c); see also SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

The ALJ must make a credibility finding any time a claimant's subjective testimony is not substantiated by objective medical evidence.  SSR 96-7p, 1996 WL 374186, at *2, 4 (July 2, 1996).  In addition to the objective medical evidence, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration,

---

[183]    SSR 96-7p was rescinded on March 27, 2017, and district courts are divided over whether SSR 16-3p applies retroactively.  See, e.g., Whitaker v. Colvin, Civil Action No. H-15-2204, 2017 WL 896160, at *21 (S.D. Tex. Feb. 15, 2017)(slip op.)(citing Mayberry v. Colvin, No. G-15-330, 2016 WL 7686850, at *5 (S.D. Tex. Nov. 28, 2016)).  In Mayberry, the court pointed out that SSR 16-3p "was designed to clarify rather than change existing law."  As the parties have not contested the applicability of SSR 96-7p, the ruling in effect at the time of the ALJ's decision, the court will apply SSR 96-7p in this case.

frequency and intensity of the claimant's symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the medication the claimant takes and any side effects; (5) other treatment that the claimant has received for relief of the symptoms; (6) any other measures used by the claimant for relief; and (7) any other relevant factors. 20 C.F.R. § 404.1529(c)(3). Other factors may include consistency, both internally and with other record evidence, treatment history, other sources of information, and observations of the claimant. SSR 96-7p, 1996 WL 374186, at *5-8 (July 2, 1996).

The ALJ must articulate the reasons for the credibility finding in his decision.

> It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Id. at *4. Although the ALJ is required to consider subjective evidence of pain and other symptoms along with other record evidence, he has the discretion to determine whether pain and other symptoms are disabling. See Wren, 925 F.2d at 128. "While an ALJ must consider an applicant's subjective complaints of pain, he is permitted to examine objective medical evidence in testing the

45

applicant's credibility. He may find, from the medical evidence, that an applicant's complaints of pain are not to be credited or are exaggerated." <u>Johnson v. Heckler</u>, 767 F.2d 180, 182 (5th Cir. 1985).

Here, Plaintiff argues that the ALJ provided insufficient bases for finding Plaintiff's testimony less than fully credible.

The ALJ followed the regulations and supporting legal authority by, first, determining that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" and, then, evaluating the medical records, the treatment notes of Plaintiff's physicians, and Plaintiff's subjective complaints.[184] The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."[185] While this statement was insufficient on its own to explain the ALJ's credibility assessment, the ALJ's later acknowledgment of reasons why Plaintiff's subjective complaints were discounted, fully complied with the regulations.

The ALJ noted that Plaintiff's use of his prosthesis was inconsistent, repeating Plaintiff's testimony that he preferred his crutches, despite the fact that he showed up to multiple

---

[184] Tr. 16-20.

[185] Tr. 17.

46

appointments wearing his prothesis.  Additionally, the ALJ found that there was a "scarcity of treating medical visits in the record."[186]

Even if the ALJ's analysis of credibility was insufficient, the court finds the failure to be harmless.  See <u>Audler v. Astrue</u>, 501 F.3d 446, 448 (5th Cir. 2007)(recognizing that, even if an error occurred, it is harmless "as long as 'the substantial rights of a party have not been affected'")(quoting <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988)).  Harmless error exists when there is no possibility that the ALJ would have reached a different conclusion absent the error.  <u>Bornette v. Barnhart</u>, 466 F. Supp.2d 811, 816 (E.D. Tex. 2006)(citing <u>Frank</u>, 326 F.3d at 622).

Here, regardless of whether Plaintiff's statements were credible, the outcome would have been the same.  The medical evidence supported that Plaintiff could utilize a prosthetic leg to ambulate and was not medically required to utilize crutches.  The court finds that Plaintiff's substantive rights were not affected by the ALJ's failure to discourse at length about Plaintiff's credibility.

**G.**  **<u>Physical and Mental Demands of Past Relevant Work</u>**

Plaintiff asserts that the ALJ did not include findings of fact about the mental and physical demands of his past relevant work, as required by SSR 82-62.

---

[186]    Tr. 20.

47

SSR 82-62 requires that the ALJ's rationale for a disability determination "be written so that a clear picture of the case can be obtained." SSR 82-62, 1982 WL 31386, at *2 (Jan. 1, 1982). If the ALJ finds that a claimant:

> has the capacity to perform a past relevant job, the determination or decision must contain . . . the following specific findings of fact:
> 1. A finding of fact as to the individuals' RFC.
> 2. A finding of fact as to the physical and mental demands of the past job/occupation.
> 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation. Id.

Plaintiff's argument that the ALJ failed to make specific findings regarding the physical and mental demands of Plaintiff's past relevant work as required by SSR 82-62 is unpersuasive. The ALJ found that Plaintiff had the following RFC:

> to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except he can lift or carry ten pounds occasionally and less than ten pounds frequently; he can stand or walk for two hours in an eight-hour day; he can sit for six hours in an eight-hour day; he may never climb ropes, ladders, or scaffolds; he can occasionally climb ramps or stairs; he is able to use crutches to ambulate; he can occasionally balance, stoop, kneel, or crouch; he can never crawl; he can perform detailed but not complex tasks; and he may not work at a forced or assembly line pace.[187]

The ALJ found that Plaintiff's past positions as a data entry clerk and proofer were semi-skilled, sedentary work. Additionally, the ALJ alternatively found that even though Plaintiff could perform his past relevant work, there were other jobs in the

---

[187]    Tr. 16.

national economy that he was capable of performing, including order clerk, telephone solicitor, or surveillance system operator.

The ALJ did not err in considering the data entry clerk position as part of Plaintiff's past relevant work and concluding that Plaintiff could return to that position. In addition, the ALJ made the findings required by SSR 82-62. Therefore, Plaintiff's arguments are without merit.

## IV. Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's motion for summary judgment and **GRANTS** Defendant's motion for summary judgment.

**SIGNED** in Houston, Texas, this 27th day of September, 2017.

_____
U.S. MAGISTRATE JUDGE